## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL SEAWRIGHT,** | : | |
| **Plaintiff** | : | |
| **v.** | : | **CIVIL ACTION NO. 1:02-1815** |
| **KENNETH KYLER,** | : | **(CONNER, D.J.)** |
| **Superintendent, ANNA** | | **(MANNION, M.J.)** |
| **MARIE FABO, Nurse, JOHN** | : | |
| **CAIN, Physician's Assistant,** | | |
| **DAWN MILLS,   Physician's** | : | |
| **Assistant,  PAT EVERHART,** | | |
| **Medical Nurse Supervisor,** | : | |
| **PAT YARGER,   Medical** | | |
| **Supervisor, MICHELE CRAIG,** | : | |
| **Nurse,  DR.  JONES, DR.** | | |
| **BERGER[1], and DR. ROEMER,** | : | |
| **Defendants** | : | |

### REPORT AND RECOMMENDATION

Presently pending before the court are: (1) the Wexford Defendants' motion for summary judgment, (Doc. No. 152); and (2) the Department Defendants' motion for summary judgment, (Doc. No. 157).  For the reasons which follow, it is recommended that both motions be granted.

## I.  PROCEDURAL HISTORY

By way of relevant background, on October 9, 2002, the plaintiff, a

---

[1]This defendant was originally named as "Dr. Burger."  However, the court notes from the Wexford Defendants' filings that the proper spelling of this defendant's name is "Berger."  As such, the proper spelling will be used in this report.

former inmate at the State Correctional Institution, Huntingdon, ("SCI-Huntingdon"), Pennsylvania, filed this civil rights action pursuant to 42 U.S.C. § 1983, along with supporting exhibits.  (Doc. Nos. 1 & 2).

As the result of an order entered by the court on November 3, 2003, and clarified on January 16, 2004, the claims which remain against the Department Defendants consist of a medical malpractice claim against defendant Fabo and a retaliation claim against all Department Defendants. (Doc. Nos. 66, 83).  In addition, claims for Eighth Amendment violations, medical malpractice and retaliation remain against the Wexford Defendants.

On October 29, 2004, the Wexford Defendants filed a motion for summary judgment, along with a brief and documentation in support thereof. (Doc. Nos. 152-54).

On November 30, 2004, the Department Defendants filed a motion for summary judgment, along with a brief and documentation in support thereof. (Doc. Nos. 157-159).

Despite having been granted an extension of time to respond to the Wexford Defendants' motion for summary judgment[2], the plaintiff did not file a brief in opposition to either of the above motions.  Instead, on December 13, 2004, the plaintiff filed "Affidavits," in which he indicates that "he is unable to submit the necessary affidavits and other evidence to oppose a summary

_____

[2]The plaintiff did not seek any extension of time to respond to the Department Defendants' motion for summary judgment.

judgment motion.[3]"   In accordance with L.R. 7.6, the pending motions for summary judgment are deemed unopposed. However, the court will review the merits of plaintiff's claims pursuant to <u>Stackhouse v. Mazurkiewicz</u>, 951 F.2d 29 (3d Cir. 1991).

---

[3]To this extent, the plaintiff argues that, despite having been ordered to do so in July 2004, the defendants have not turned over discovery necessary for him to respond to the pending motions for summary judgment. (Doc. Nos. 160, 161).

Upon review of the record in the instant action, by order dated April 1, 2004, the court set a discovery deadline of September 30, 2004. (Doc. No. 128). During the pendency of this action, the plaintiff had filed numerous requests for discovery and motions to compel discovery which, according to the record, were all resolved prior to the discovery deadline. Upon approach, the plaintiff did not request an extension of the discovery deadline, nor did he file any further motions to compel indicating that further discovery was outstanding. In fact, in requesting an extension of time to respond to the Wexford Defendants' motion for summary judgment, the plaintiff did not base his motion on the need for discovery, but indicated that the extension was necessary "so that plaintiff can study and possibly learn how to draft a proper motion in response to said defendants' motion for summery (sic) judgement." In addition, the plaintiff indicated that "[t]his request is necessitated by the fact that plaintiff is not in possession of any of his legal work as pertaining to the above captioned matter. Plaintiff has forwarded his complete files to an attorney who has shown interest in entering an appearence (sic) on plaintiff's behalf." (Doc. No. 155). It was not until the plaintiff filed his "Affidavits," some two and one-half months after the expiration of the discovery deadline that the plaintiff indicated that additional discovery is needed to respond to the pending motions for summary judgment.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56©).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56©) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Id. The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party."  Childers v. Joseph,

4

842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted).  Material facts are those which will effect the outcome of the trial under governing law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The court may not weigh the evidence or make credibility determinations.  <u>Boyle v. County of Allegheny</u>, 139 F.3d 386, 393 (3d Cir. 1998).  In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.  <u>Id.</u> at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor.  <u>Id.</u>

## III.  WEXFORD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Generally, the plaintiff alleges that the defendants denied him adequate medical care for an injury to his right Achilles tendon in violation of his Eighth Amendment rights; that the defendants committed medical malpractice; and that the defendants retaliated against him for filing grievances against them in violation of his First Amendment rights.  (Doc. No. 1).

With respect to the Wexford Defendants, the plaintiff specifically alleges that he was seen by defendant Mills on September 14, 2001, one week after he reportedly injured his leg.  The plaintiff alleges that defendant Mills examined his leg and told him that he had tendonitis.  He further alleges that she stated that it would heal within a few days and prescribed him pain

5

medication.  (Doc. No. 1, ¶ 9).

On September 21, 2001, the plaintiff alleges that he reported to the infirmary because of unbearable pain at which time he was seen by defendant Cain. According to the plaintiff's complaint, defendant Cain examined him and informed him that he had a defect in his Achilles tendon.  As a result, defendant Cain issued the plaintiff pain medication and suggested that he do exercises. The plaintiff alleges that his request for crutches, a cane, or an ace bandage was denied on the basis that defendant Cain "didn't want to baby the injury." (Doc. No. 1, ¶ 10).

On September 27, 2001, the plaintiff returned to the infirmary and was again seen by defendant Cain.  On this occasion, the plaintiff alleges that defendant Cain indicated that the injury to the Achilles tendon was worse than he had originally thought and indicated that the plaintiff had a partial tear of the tendon.  Despite this, the plaintiff alleges that defendant Cain refused to provide him with pain medication and refused to order that the plaintiff be removed from the second tier so that he would not have to climb up and down the stairs.  The plaintiff indicates that defendant Cain did, however, order x-rays of his ankle which were taken on October 3, 2001.  (Doc. No. 1, ¶ 11).

On October 4, 2001, the plaintiff alleges that he suffered a subsequent injury to his Achilles tendon after which he was seen by defendant Mills.  At this time, the plaintiff states that he was simply told to go back to his cell and take Motrin.  He again alleges that he requested and was denied an order to

6

be removed from the second tier.  (Doc. No. 1, ¶ 13).

On October 5, 2001, the plaintiff alleges that he was treated by defendant Jones, who indicated that he had a partial tear of the Achilles tendon.  According to the plaintiff, defendant Jones placed his lower right leg in a cast indicating that this should have been done sooner.  The plaintiff states that defendant Jones prescribed him Tylenol #3 and directed that he be removed from the second tier.  (Doc. No. 1, ¶ 14).

The plaintiff alleges that he was treated by defendant Berger on October 19, 2001, who informed him that the following would be the standard initial treatment for an Achilles tendon injury:

> A.) The patient should be taken out of immediate pain with adequate pain medication.  He said motrin was not adequate because it was not strong enough to suppress pain from partial torn tendons or muscles.
>
> B.)  That x-ray or M.R.I. be conducted because it is the only way the extent of the injury could be properly diagnosed.
>
> C.)  Stabilize the foot in a cast to prevent further damage to a weakened tendon.

(Doc. No. 1, ¶ 15)(Parenthetical information omitted).

On November 6, 2001, the plaintiff claims that he presented to defendant Cain with a request for a cane instead of crutches.  At that time, the plaintiff alleges that defendant Cain became agitated and began yelling at him. The plaintiff further claims that defendant Cain attempt to get him to sign a form indicating that he refused to use his crutches.  When the plaintiff

7

refused, he alleges that defendant Cain became more enraged.  The plaintiff alleges that he was given permission to leave the infirmary from another attendant.  (Doc. No. 1, ¶ 16).

On the following day, the plaintiff alleges that he was called to the infirmary, at which time defendant Cain threatened him with a medical cell confinement if he did not use his crutches.  During the course of this visit, the plaintiff alleges that defendant Cain again became agitated and yelled at him.  According to the plaintiff, he reported this incident to defendant Cain's supervisor, Department Defendant Everhart.  (Doc. No. 1, ¶¶ 17-20).

On March 1, 2002, the plaintiff claims that he was placed on a level 5 medical lay in and confined to his cell 24 hours per day.  The plaintiff alleges that he was later informed that the medical lay in was ordered by defendant Cain in retaliation for his complaints.  (Doc. No. 1, ¶ 37, 45).

In response to the plaintiff's claims, the Wexford Defendants have submitted a statement of material facts, which is supported by various exhibits.  The Wexford Defendants' statement of material facts establishes that on September 7, 2001, the plaintiff reported to the infirmary at SCI-Huntingdon complaining that he had injured his ankle while playing basketball.  It was noted at that time that the plaintiff had walked to the infirmary.  Upon examination, no swelling or bruising was noted.  In addition, the plaintiff was noted to have a good range of motion.  The plaintiff was given an ice pack and told to go to sick call if needed.  (Doc. No. 153, Ex. A, pp. 1-2).

One week later, on September 14, 2001, the plaintiff presented to the infirmary with continued complaints of ankle pain. (Doc. No. 153, Ex. A, p. 2). The plaintiff was examined by defendant Mills, who found that he had a full range of motion in his ankle with pain noted on dorsiflexion.  No swelling was noted.  The plaintiff had tenderness to palpation in the area of the Achilles tendon.  The plaintiff was diagnosed with tendonitis and was directed to apply warm compresses to the area.  In addition, the plaintiff was prescribed Motrin. Defendant Roemer reviewed and approved defendant Mills' order.  (Id. at p. 73).

On September 21, 2001, the plaintiff reported to the infirmary complaining that his injury was worsening. The plaintiff was referred to defendant Cain.  Upon examination, the plaintiff was noted to have a mild antalgic gait with a small defect of tissue noted on the calf in the Achilles tendon area.  The plaintiff was noted, however, to have full range of motion and the Achilles tendon was noted to be intact.  The plaintiff was instructed on range of motion and stretching exercises and was prescribed Motrin.  Again, defendant Roemer reviewed and approved this course of action.  (Doc. No. 153, Ex. A, pp. 3, 74).

On October 2, 2001, the plaintiff continued to complain of pain and was again examined by defendant Cain.  At this time, the plaintiff still had a mild antalgic gait with tenderness in the right Achilles area.  The plaintiff was noted to have a palpable defect in the posterior Achilles tendon.  The plaintiff was

9

able to plantar flex and dorsiflex without difficulty, but had difficulty standing on his toes.  A Thompson's test was positive[4].  Defendant Cain opined that the plaintiff had a partial tear of the Achilles tendon.  Upon consultation with defendant Roemer, it was agreed that the plaintiff should be examined by an orthopedic surgeon.  X-rays were ordered which were negative for fracture. (Doc. No. 153, Ex. A, pp. 74, 114).

On October 4, 2001, the plaintiff presented to the infirmary complaining that he felt something "pop" after which he experienced pain in his right ankle. The plaintiff was examined by defendant Mills, who found pain to palpation along the Achilles tendon.  Pulse and sensation were noted to be intact.  No swelling was noted.  Because of complaints of pain, defendant Mills was unable to check for ankle jerk reflex.  Defendant Mills issued the plaintiff crutches until his orthopedic consultation the following day.  The plaintiff was instructed to continue Motrin for pain.  (Doc. No. 153, Ex. A, pp. 4, 74).

On the following day, the plaintiff was examined by defendant Jones, who is an orthopedic surgeon.  After examining the plaintiff, defendant Jones opined that the plaintiff had a partial tear of his Achilles tendon.  As a result,

---

[4]The Wexford Defendants' materials provide that the Thompson's test is designed to detect injury to the Achilles tendon.  In performing this test, the clinician squeezes the muscles of the calf with the patient lying prone.  If the foot moves in plantar flexion, the Achilles tendon is patent and is not ruptured. No flexion is indicative of a complete rupture of the tendon.  A positive Thompson's test indicates that the Achilles tendon is intact.  (Doc. No. 153, p. 6).

he ordered that the plaintiff use crutches and directed that he be weightbearing only for balance.  The plaintiff was scheduled for a follow-up and given Motrin and Tylenol #3.  (Doc. No. 153, Ex. A, p. 115).

On October 19, 2001, the plaintiff was examined by defendant Berger, who recommended that the plaintiff's ankle remain immobilized.  Defendant Berger noted that, if upon the plaintiff's next examination, a complete tear was found, surgery would be recommended if desired by the plaintiff.  (Doc. No. 153, Ex. A, p. 117).

The plaintiff was next examined by defendant Berger on November 1, 2001.  At that time, it was noted that the plaintiff had a partial rupture of his right Achilles tendon.  Upon examination, defendant Berger indicated that the tendon was still hardened and swollen, but that the plaintiff had good pull.  It was recommended that the plaintiff be placed in a cast for another five weeks, after which defendant Berger indicated that the plaintiff would probably be placed in a high heeled shoe.  (Doc. No. 153, Ex. A, p. 119).

On November 6, 2001, the plaintiff requested that he be able to use a cane instead of the crutches which were prescribed to him.  Defendant Cain attempted to contact defendant Berger to see if this was acceptable, but was unable to do so.  As a result, he instructed the plaintiff to continue using the crutches until he could confirm that the substitution was acceptable.  (Doc. No. 153, Ex. A, p. 7).

On the following day, the plaintiff presented at the infirmary carrying, not

11

using, his crutches.  At that time, defendant Cain informed the plaintiff that he had been in contact with defendant Berger who indicated that the plaintiff was to use the crutches with the cast and remain non-weightbearing.  The plaintiff was specifically directed not to use a cane.  The plaintiff was informed that, if he insisted on not using the crutches, he would be confined to the infirmary to prevent injury to the cast or his Achilles tendon.  The plaintiff agreed to use the crutches.  (Doc. No. 153, Ex. A, p. 7).

On November 9, 2001, defendant Roemer noted that the plaintiff presented to the infirmary carrying, not using, his crutches.  At that time, defendant Roemer explained to the plaintiff the importance of using the crutches and the risks involved in not doing so.  (Doc. No. 153, Ex. A, p. 8).

The plaintiff was next treated by defendant Berger on December 5, 2001, at which time the cast was removed and he was given a rigid boot to wear.  (Doc. No. 153, Ex. A, p. 121).

On December 18, 2001, the plaintiff complained to defendant Mills about pain in his ankle.  Defendant Mills prescribed the plaintiff Tylenol.  (Doc. No. 153, Ex. A, pp. 10, 79).

On December 24, 2001, the plaintiff indicated to defendant Cain that he was about the same and ambulating well.  The plaintiff's prescription for Tylenol was renewed and he was scheduled for a follow-up with defendant Berger.  (Doc. No. 153, Ex. A, pp. 11, 80).

The plaintiff presented to defendant Cain on January 17, 2002,

complaining that Motrin upset his stomach and that Tylenol worked, but not long enough. Defendant Cain prescribed the plaintiff extra strength Tylenol. (Doc. No. 153, Ex. A, pp. 13, 81).

On February 21, 2002, the plaintiff treated with defendant Berger. At that time, the plaintiff's Achilles tendon was noted to be palpably intact with no tenderness or edema. It was, however, tight with dorsiflexion of the ankle. Defendant Berger directed that the plaintiff's brace be discontinued and directed the plaintiff to do stretching and strengthening exercises. The plaintiff was put on the "M.D. Line" to receive instruction on how to do the exercises. (Doc. No. 153, Ex. A, pp. 16, 83, 123).

On the following day, the plaintiff complained of tightness in the Achilles tendon to Dr. Symons. Dr. Symons discontinued the extra strength Tylenol and prescribed the plaintiff Tylenol #3. The plaintiff was directed to return in one week to increase his exercises. (Doc. No. 153, Ex. A, pp. 17, 83).

On February 25, 2002, the plaintiff presented to defendant Cain complaining of continued leg pain. Defendant Cain prescribed the plaintiff Motrin, as well as Maalox or Pepto Bismol for stomach discomfort. (Doc. No. 153, Ex. A, pp. 18, 83).

On March 1, 2002, the plaintiff treated with Dr. Symons, who renewed the plaintiff's prescription for Tylenol #3 and directed that he return in one week. The plaintiff was noted to need new sneakers which the nurse was directed to check into. (Doc. No. 153, Ex. A, p. 84).

13

On March 14, 2002, the plaintiff was again seen by Dr. Symons, who noted the plaintiff's ability to perform his therapy exercises.

Between March 19, 2002, and February 5, 2003, the plaintiff was transferred among correctional facilities.   During this time, the plaintiff received various forms of follow-up treatment at these facilities.  (Doc. No. 153, Ex. A, 19-26, 28-30, 34-36, 94, 86-90, 126).

On February 5, 2003, the plaintiff was returned to SCI-Huntingdon. Upon return, the plaintiff was seen by Dr. Araneda, who noted that the plaintiff limped with a cane.  Upon examination, the plaintiff's Achilles tendon was noted to be okay.  A prescription for Naproxen, which the plaintiff had received while outside SCI-Huntingdon, was renewed.  (Doc. No. 153, Ex. A, pp. 40-44).

On March 14, 2003, the plaintiff presented to the infirmary complaining of pain in his Achilles tendon after walking up the stairs.  Upon examination, defendant Mills found no edema and a symmetrical range of motion.  The plaintiff was prescribed Motrin.  Although the plaintiff requested lower tier status, defendant Mills found no basis on which to order this status. (Doc. No. 153, Ex. A, pp. 44, 99).

On March 17, 2003, the plaintiff again complained of pain in his Achilles tendon and requested lower tier status.  Defendant Mills instructed the plaintiff to continue with his strengthening exercises and, again, found no basis on which to enter a lower tier order.  (Doc. No. 153, Ex. A, p. 45).

14

On March 25, 2003, the plaintiff was examined by Dr. Felipe Arias, who found the plaintiff's right Achilles tendon to be thickened and tender to palpation.  The plaintiff was further found to have a loss of dorsiflexion.  Dr. Arias opined that the plaintiff would likely be able to regain full function with further physical therapy.  (Doc. No. 153, Ex. A, p. 46).

The plaintiff was seen by a physical therapist on April 13, 2003.  At that time, the plaintiff was shown an exercise regimen and instructed to perform it on a daily basis.  (Doc. No. 153, Ex. A, p. 127).

On July 8, 2003, the plaintiff followed-up with the physical therapist, who noted that the plaintiff was doing well.  The plaintiff was instructed on range of motion, joint mobility, and isometric exercises.  It was recommended that the plaintiff be provided with ice for swelling of his ankle.  (Doc. No. 153, Ex. A, pp. 48, 128).

The plaintiff was again seen by Dr. Arias on August 15, 2003.  Dr. Arias noted that the plaintiff had continued complaints of pain.  Upon examination, the plaintiff had some limitation of range of motion with the tendon on the right thickened to that on the left.  It was recommended that the plaintiff be given ice and that he continue with physical therapy.  In addition, Dr. Arias indicated that the plaintiff may need a referral to an orthopedic specialist.  (Doc. No. 153, Ex. A, pp. 50, 104).

On September 5, 2003, Dr. Arias ordered continued physical therapy. (Doc. No. 153, Ex. A, p. 52).

15

The plaintiff presented to defendant Mills for treatment on December 22, 2003.  However, his treatment was terminated with a notation that the plaintiff had yelled obscenities at her.  Defendant Mills noted that the plaintiff had been scheduled to see an orthopedic surgeon.  (Doc. No. 153, Ex. A, p. 55).

On March 2, 2004, the plaintiff was transferred to SCI-Camp Hill where he was seen by Thomas J. Yucha, an orthopedic surgeon.   Upon examination, the plaintiff had no swelling, ecchymosis or tenderness at the ankle.  The plaintiff did have an inability to bear weight on his toes.  In addition, he was noted to walk flat-footed.  Thompson's test was negative. Sensory, motor, reflex and vascular exams were normal with peroneal strength within normal limits.  Dr. Yucha opined that the plaintiff's tendon had healed in an elongated state and that surgical shortening might correct the condition.   The plaintiff agreed with this course of action.   As a result, bloodwork was done to prepare him for surgery and the surgery was scheduled for March 11, 2004.  (Doc. No. 153, Ex. A, pp. 129-34).

Notes from March 10, 2004, indicate that the plaintiff presented to the infirmary requesting extra strength Tylenol and stating that he was contemplating not having the surgery.  Later that same day, the plaintiff was returned to the infirmary for surgical preparation instructions.  At that time, the plaintiff indicated that he did not need the surgery and refused to be transferred to the hospital.  (Doc. No. 153, Ex. A, pp. 62, 132).

The Wexford Defendants' materials reflect that defendant Berger never

16

informed the plaintiff that he was not getting enough pain medication or that he should have been placed in a cast earlier.  Moreover, defendant Berger denies that he ever told the plaintiff that he needed an MRI and further indicates that nothing prevented him from ordering one if it was needed. Finally, defendant Berger indicates that patients who suffer Achilles tendon injuries do not always regain full function and sometimes have residual limitations.  He indicates that every patient's situation is unique.  (Doc. No. 153, Ex. B, ¶¶ 16-17).

In order to establish an Eighth Amendment claim based upon allegations of denial of proper medical care, an inmate must demonstrate a deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97 (1976).  This standard requires both deliberate indifference on the part of the prison officials and a serious medical need on the part of the prisoner. See West v. Keve, 571 F.2d 158 (3d Cir. 1978).

A deliberate action is one which is intentional, requiring the actor to have knowledge of the events attributed to the injury and the ability to control the outcome.  "To establish a constitutional violation, the indifference must be intentional and the action related thereto deliberate." Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1081 (3d Cir. 1976).  A mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives, does not support an Eighth Amendment claim.  Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa.

17

1988).  See <u>McCracken v. Jones</u>, 562 F.2d 22, 24 (l0th Cir. 1977); <u>Smart v. Villar</u>, 547 F.2d 112, 113 (l0th Cir. 1976), <u>cert. denied.</u>, 450 U.S. 1041 (1981).

A medical need is "serious" where it has been diagnosed by a physician as mandating treatment, or if it is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  <u>See Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203 (1st Cir. 1990), <u>cert. denied</u>, 500 U.S. 956 (U.S. Mass. June 3, 1991) (No. 90-7632)(citing <u>Monmouth County Correctional Institutional Inmates v. Lanzaro</u>, 834 F.2d 326 (3d Cir. 1987)).

The Supreme Court has held that negligence or inadvertence alone do not rise to the level of a constitutional deprivation.  <u>Whitley v. Albers</u>, 475 U.S. 312 (1986); <u>Davidson v. O'Lone</u>, 474 U.S. 344 (1986).  In <u>Daniels v. Williams</u>, 474 U.S. 327 (1986), the Court noted that "[l]ack of due care suggest no more than a failure to measure up to the conduct of a reasonable person."  Where a state of mind is relevant, the complaint is inadequate if it merely contains conclusory allegations describing the requisite state of mind such as "intentionally" or "recklessly" without supporting factual allegations.  <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991).

Further, where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, the federal courts are generally reluctant to second guess medical judgment and to constitutionalize claims which sound in state tort law.  <u>See  Ellison v. Scheipe</u>, 570 F.Supp. 1361, 1363 (E.D.Pa. 1983); <u>Inmates of Allegheny Jail v. Pierce</u>, 612 F.2d 754,762

18

(3d Cir. 1979); See also Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desired. Farmer v. Carlson, supra, 685 F. Supp. at 1339.

With respect to the instant action, it is apparent that the plaintiff received medical care for his Achilles tendon injury on a continuing and regular basis. The care included regular examinations, pain medication and diagnostic testing. It is also apparent that the plaintiff is simply disagreeing with the medical care he received.

The plaintiff complains of the type of pain medication he received. However, the fact that the plaintiff was not given the type of pain medication which he desired does not rise to the level of an Eighth Amendment violation. See Coleman v. Fram, 843 F.Supp. 993, 994 (E.D.Pa.,1994)("Plaintiff was prescribed pain medication, however, he asserts that this medication has been ineffective. While plaintiff may disagree with the efficacy of the treatment provided to him, the conduct he complains of does not amount to a constitutional violation. Plaintiff may not demand a particular type of treatment as long as some treatment is provided.")(citing Wright v. Collins, 766 F.2d 841 (4th Cir.1985); Campbell v. Sacred Heart Hospital, 496 F.Supp. 692 (E.D.Pa.1980)).

The plaintiff also claims that he should have undergone diagnostic testing immediately upon his injury. This claim also does not rise to the level

of a constitutional violation.  This issue was decided by the United States Supreme Court in <u>Estelle v. Gamble</u>, 429 U.S. 97, 107 (1976)(". . . the question of whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel or unusual punishment.").

Finally, the plaintiff claims that he should have been placed in a cast earlier than actually prescribed.  Again, whether or not the plaintiff should have been placed in a cast is a question best left to medical judgment and, in fact, the record reveals that the plaintiff was placed in a cast immediately upon displaying objective signs of injury to the Achilles tendon.

Based upon the above, the Wexford Defendants' motion for summary judgment should be granted to the extent that the plaintiff alleges a violation of his Eighth Amendment rights by these defendants.

Although the Wexford Defendants have not addressed the plaintiff's claim of medical malpractice against them in their motion for summary judgment, for the reasons set forth below addressing the plaintiff's claim of medical malpractice against defendant Fabo, the Wexford Defendants should also be granted judgment as a matter of law on this claim.

Finally, to the extent that the plaintiff alleges that he was placed on a medical lay in on March 1, 2002, in retaliation for filing grievances, and that defendant Symons informed him on March 4, 2002, that defendant Cain was

20

the cause of the medical lay in, there is nothing in the records before the court to substantiate these allegations.  In fact, the only notation from March 1, 2002, indicates that the plaintiff treated with defendant Symons at which time defendant Symons renewed the plaintiff's prescription for Tylenol #3 and directed that he return in one week.  In addition, defendant Symons noted that the plaintiff needed new sneakers and directed the nurse to check into the matter.  There is no indication from this progress note that the plaintiff was placed on medical lay in status or that any such status was discussed with the plaintiff.  In addition, there are no treatment records of the plaintiff for March 4, 2002.  Given this, the plaintiff cannot met the requirements of a First Amendment retaliation claim, as set forth below, and the Wexford Defendants should be granted judgment as a matter of law with respect to the plaintiff's retaliation claim against defendant Cain.

## IV.  DEPARTMENT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As noted above, the only claims which remain against the Department Defendants are a medical malpractice claim against defendant Fabo and a First Amendment retaliation claim against defendants Kyler, Fabo, Everhart, Yarger and Craig.

With respect to these claims, the plaintiff alleges that he was initially evaluated for his injury by defendant Fabo on the day of its occurrence.  (Doc. No. 1, ¶¶ 1-2).  At that time, the plaintiff alleges that, despite his complaints

of pain and immobility, defendant Fabo indicated that she could not see anything wrong with his leg. (Id. at ¶ 2). Although the plaintiff requested medication for his pain, he alleges that defendant Fabo refused to give him any and, instead, gave him an ice pack[5]. (Id. at ¶ 3).

On the following day, the plaintiff alleges that he again reported to defendant Fabo, who indicated that she did not see anything wrong with his leg and that he just had an ankle injury[6]. (Doc. No. 1, ¶ 4). The plaintiff alleges that defendant Fabo informed him at that time that, if he wanted to see a doctor, he would have to sign up for sick call. (Id. at ¶ 5). Again, the plaintiff alleges that he was provided an ice pack, but no medication for his pain. (Id. at ¶ 6). According to the plaintiff, he did not seek further medical treatment until September 14, 2001, because he was "intimidated" by defendant Fabo. (Id. at ¶ 8).

The plaintiff alleges that his next encounter with defendant Fabo occurred on December 11, 2001, when she threatened him for filing a

---

[5]The exhibits supplied by the plaintiff with his complaint indicate that only physicians and physicians' assistants are permitted to dispense medications, and that nurses are not permitted to do so. (Doc. No. 2, Ex. D).

[6]The documentation submitted by the plaintiff indicates that there is no record of the plaintiff reporting to the medical department on September 8, 2001, and that defendant Fabo has no recollection of seeing him on that date. (Doc. No. 2, Ex. D).

grievance against her[7].  (Doc. No. 1, ¶ 24).  According to the plaintiff, on December 18, 2001, he filed a grievance with respect to defendant Fabo's statement, but that his grievance was dismissed on January 10, 2002, for lack of merit.  (Id. at ¶¶ 28-29).

With respect to defendants Kyler, Everhart, and Yarger, the plaintiff's allegations center around their denial of his formal and informal grievances. (Doc. No. 1, ¶¶ 20, 23, 24, 27, 29, 32, 33, 34).  In addition, the plaintiff alleges that defendant Yarger threatened him by stating "as long as you continue to file grievances on us you will continue to receive misconducts and this is a battle you can't win Mr. Seawright."  (Id. at ¶ 33).

With respect to defendant Craig, the plaintiff alleges that on March 1, 2002, she yelled at him when he went to receive his medication.  (Doc. No. 1, ¶ 39).  Later that day, the plaintiff alleges that defendant Craig issued him a misconduct report charging him with presence in an unauthorized area and refusing to obey an order.  (Id., ¶ 40).  The plaintiff alleges that these charges were dismissed at a misconduct hearing held on March 5, 2002.  (Id. at ¶ 42).

In response to the plaintiff's allegations, the Department Defendants have submitted a statement of material facts supported by various documentation which establishes, with respect to the plaintiff's claim of

---

[7]Specifically, the plaintiff alleges that defendant Fabo stated "from this day on you have a reason to be afraid of me since you filed a grievance against me."  (Doc. No. 1, ¶ 24).

23

medical malpractice, that the plaintiff alleged to have suffered an injury to his lower right leg on September 7, 2001. (Doc. No. 159, Ex. A, ¶ 16).  On that date, the plaintiff alleges that defendant Fabo's treatment of him was inadequate because she did not provide him with pain medication or refer him to a doctor.  (Id. at ¶ 19).  Medication can only be prescribed by a doctor or physician's assistant.  (Id. at ¶ 20).  Inmates can see a doctor or physician's assistant by requesting a visit and being placed on the sick call list.  (Id. at ¶ 21).  Although the plaintiff alleges that he was in severe pain on September 7, 2001, when he was seen by defendant Fabo, he did not sign up for sick call until September 14, 2001.  (Id. at ¶ 22).  Finally, with respect to the plaintiff's claim of medical malpractice, the Department Defendants' materials provide that, discovery having been concluded, the plaintiff has neither retained the services of a medical expert, nor presented evidence that he will be presenting any expert medical evidence at trial.  (Id. at ¶ 23).

In order to establish a claim of medical malpractice in Pennsylvania, a plaintiff must show that: (1) the medical care provider owed a duty to the plaintiff; (2) the medical care provider breached that duty; (3) the breach of duty was the proximate cause of, or substantial factor in, bringing about the harm suffered by the plaintiff, and (4) the damages suffered by the plaintiff were a direct result of that harm.  Mitzelfelt v. Kamrin, 584 A.2d 88, 891 (Pa. 1990); See Carlotti v. Employees of General Elec. Fed. Credit Union No. 1161, 717 A.2d 564 (Pa. Super. 1998).  Moreover, a plaintiff generally must

present an expert who will testify, to a reasonable degree of medical certainty, that the acts of the defendant deviated from the acceptable medical standards, and that the deviation constituted a substantial factor in causing the plaintiff's injury. Flanagan v. Labe, 666 A.2d 333 (Pa. Super. 1995).

The plaintiff in this matter is proceeding in forma pauperis. Title 28 U.S.C. § 1915, which pertains to proceeding in forma pauperis, provides access to courts for indigent individuals by waiving certain fees, including filing and transcript fees. However, in providing this relief, there is no indication that Congress intended to fund discovery or expert witness costs during an indigent individual's litigation. The benefits § 1915 provides to indigent individuals "does not mean that the in forma pauperis plaintiff's discovery costs are either underwritten or are waived." McAllese v. Owens, 88-1669, 1990 U.S. Dist. LEXIS 4539, *11(MDPA)(March 29, 1990). In fact, "Courts uniformly have refused to authorize the expenditure of federal funds to underwrite discovery costs of an indigent's civil action . . ." McAllese, Id. at *16. Similarly, in Boring v. Kozakiewicz, 833 F.2d 468 (3d Cir.) cert. denied, 485 U.S. 991 (1988), the Third Circuit ruled that while an indigent plaintiff's case required expert testimony in order to meet the burden of proof, the district court was correct in refusing to provide funds for the plaintiff's retention of the required expert testimony. The Third Circuit, while recognizing the plaintiff's dilemma, noted that district court's lack authority to provide those funds, absent specific legislative provisions.   Id. at 474.

The only exception to the requirement of expert witness testimony in a medical malpractice claim is where the matter is "'so simple, and (the) lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even nonprofessional persons.'" <u>Berman</u>, <u>supra</u>, 205 F. Supp. 2d at 364 (citing <u>Brannan v Lankenau Hospital</u>, 490 PA 588 (1980)).

In this case, as the Department Defendants' materials provide, the plaintiff has not provided any expert evidence that the acts of defendant Fabo deviated from acceptable medical standards, and that the deviation constituted a substantial factor in causing him injury. Therefore, the only basis upon which this claim can continue is if the alleged malpractice is so obvious as to be within the range of ordinary experience and comprehension. It is not at all clear that the plaintiff's medical condition was severe, despite his many protestations to the contrary; nor is it obvious that there was any lack of skill or want of care in the plaintiff's treatment. Therefore, under the facts of this case, the requirement that an expert witness testify that the defendant's actions deviated from acceptable medical standards is not waived, and the plaintiff cannot state a <u>prima</u> <u>facie</u> medical malpractice cause of action. As such, the Department Defendants' motion for summary judgment should be granted with respect to the plaintiff's claim of medical malpractice against defendant Fabo.

With respect to the plaintiff's claim of First Amendment retaliation, the

26

Department Defendants' materials provide that the plaintiff does not allege that he has been hindered from accessing the courts and, in fact, continues to file institutional grievances after the alleged retaliation. (Doc. No. 159, Ex. A, ¶ 26).  Moreover, the record establishes that the plaintiff has a pattern of misbehaving and that he incurred misconduct charges both before and after the misconducts at issue.  (Id. at ¶¶ 39-40).

In addition, the Department Defendants' materials provide that, while the plaintiff alleges that he received three misconducts in retaliation for filing grievances against the defendants, he has not established that any of the misconducts were actually related to the exercise of his First Amendment rights, nor has he established that the misconducts would deter a person of ordinary firmness from engaging in the constitutionally protected activity. (Id. at ¶ 27).  In fact, the Department Defendants' materials establish that only one of the three misconducts alleged by the plaintiff to have been in retaliation for filing grievances against the defendants was reported by or involved any of the named Department Defendants.  (Id. at ¶ 29).  To this extent, defendant Craig reported a misconduct on March 1, 2002, which was witnessed by two other officers, who are not named defendants in this action.  (Id. at ¶¶ 30-31). This misconduct, which was related to the plaintiff's presence in an unauthorized area, was ultimately dismissed because it was discovered that Dr. Symons had given the plaintiff permission to be in the area.  (Id. at ¶ 32). Otherwise, the actions of the plaintiff would have been in violation of

27

institutional rules of conduct.  (Id. at ¶ 33).  With respect to the other two misconducts issued to the plaintiff by officials not named in the instant action, the plaintiff was either found or entered a plea of guilty to the charges.  (Id. at ¶ 35).  In each of the cases in which a misconduct was issued, the plaintiff does not allege that he was denied a hearing or a decision by an independent hearing examiner.  (Id. at ¶¶ 36-37).

In order to state a claim of First Amendment retaliation, the plaintiff must establish: (1) that he engaged in constitutionally protected conduct, (2) which resulted in adverse action by prison officials "'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights,'" and (3) "a causal link between the exercise of his constitutional rights and the adverse action taken against him."  Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)(quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)("[G]overnment actions, which standing alone do not violate the Constitution, may none the less be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.").

In this case, other than setting forth allegations in his complaint, the plaintiff has failed to establish that the issuance of the three misconducts in question in this case was causally connected to his filing grievances with respect to his medical treatment.  There is no evidence on the record that these misconducts were issued based upon the plaintiff's filing of grievances related to his medical treatment. In addition, it obvious from the Department

Defendants' materials that the issuance of the misconduct did not have an adverse effect on the plaintiff in that he has continued to file institutional grievances and proceed with the instant action.

Based upon the above, the Department Defendants' motion for summary judgment should also be granted with respect to the plaintiff's First Amendment retaliation claim.


## V.  CONCLUSION

On the basis of the foregoing,

**IT IS RECOMMENDED THAT:**

**(1)** the Wexford Defendants' motion for summary judgment, **(Doc. No. 152)**, be **GRANTED**; and

**(2)** the Department Defendants' motion for summary judgment, **(Doc. No. 157)**, be **GRANTED**.


**s/ Malachy E. Mannion**
**MALACHY E. MANNION**
**United States Magistrate Judge**


**Date: July 28, 2005**

O:\shared\REPORTS\2002 Reports\02-1815.1.wpd